# No. 15-51164

---

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

### UNITED STATES OF AMERICA,
### Plaintiff-Appellee,

### v.

### CRISTOBOL VELASQUEZ, also known as Little Cris; RAUL RODRIGUEZ, also known as Fat Boy; GEORGE SANCHEZ, also known as Curious; and MIKE CASSIANO, Defendants-Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, DEL RIO DIVISION,
DISTRICT COURT No. 2:11-CR-01781-AM-14

---

## APPELLANT GEORGE SANCHEZ'S
## BRIEF ON THE MERITS

---

**Shane Stolarczyk**
**KELLER STOLARCZYK, PLLC**
**234 W. Bandera Rd., No. 120**
**Boerne, Texas 78006**
**Tele: 830.981.5000**
**Facs: 888.293.8580**

## **CERTIFICATE OF INTERESTED PERSONS**

UNITED STATES OF AMERICA,
　　　　　　Plaintiff-Appellee,

v.                                                     No. 15-51164

GEORGE SANCHEZ,
　　　　　　Defendant-Appellant.

　　　The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

　　　1.  United States of America

Trial Counsel                          Appellate Counsel

Matthew Watters
Patrick Burke                          Joseph Gay
Ralph Paradiso                         U.S. Attorney's Office
Erica Giese                            601 N.W. Loop 410, Ste. 600
U.S. Attorney's Office                 San Antonio, TX 78216
111 E. Broadway, Ste. 300
Del Rio, TX 78840

2. George Sanchez

<u>Trial Counsel</u>

Charles King
Law Office of Charles King
101 South Park St.
San Angelo, TX 76901

<u>Trial Counsel</u>

Rafael Leal
Law Office of Rafael Leal
118 Ashby Place
San Antonio, TX 78212

<u>Appellate Counsel</u>

Shane Stolarczyk
Keller Stolarczyk PLLC
234 W. Bandera Road, # 120
Boerne, Texas 78006

3. The Honorable Alia Moses, United States District Judge

## STATEMENT REGARDING ORAL ARGUMENT

Appellant believes oral argument will assist the Court in determining the disposition of the issues presented. This case presents two errors of constitutional dimension that impugned Appellant's fundamental right to a fair trial. Not only was the Government allowed to introduce evidence of Appellant's gang affiliated tattoos at the start of the trial without justification, one of its witnesses later directly commented on Appellant's eventual failure to testify only one day before jury deliberations commenced. The constitutional implications of the errors at issue are great, and the Court should allow the parties the opportunity to present their contentions at oral argument. Accordingly, oral argument is requested by Appellant Sanchez.

# **TABLE OF CONTENTS**

*Page*

CERTIFICATE OF INTERESTED PERSONS .............................. 2

STATEMENT REGARDING ORAL ARGUMENT ......................... 4

TABLE OF CONTENTS ............................................ 5

TABLE OF CITATIONS ........................................... 9

STATEMENT OF JURISDICTION ............................................ 14

STATEMENT OF THE ISSUES ............................................... 15

ISSUE ONE:      THERE IS INSUFFICIENT EVIDENCE TO SUPPORT
                ANY OF APPELLANT'S CONVICTIONS.

ISSUE TWO:      A GOVERNMENT WITNESS INFRINGED APPELLANT'S
                CONSTITUTIONAL RIGHTS WHEN SHE IMPROPERLY
                COMMENTED ON APPELLANT'S EVENTUAL
                ELECTION OF HIS RIGHT NOT TO TESTIFY.

ISSUE THREE:    THE DISTRICT COURT INFRINGED APPELLANT'S
                CONSTITUTIONAL RIGHTS BY ALLOWING THE
                GOVERNMENT TO ADMIT EVIDENCE OF
                APPELLANT'S GANG-AFFILIATED TATTOOS.

ISSUE FOUR:     THE CUMULATIVE EFFECT OF THE ERRORS AT
                ISSUE SO FATALLY INFECTED APPELLANT'S TRIAL
                THAT THEY VIOLATED HIS TRIAL'S FUNDAMENTAL
                FAIRNESS.

STATEMENT OF THE CASE .................................................. 16

SUMMARY OF THE ARGUMENT ........................................... 21

ARGUMENT ........................................................ 23

THERE IS INSUFFICIENT EVIDENCE TO SUPPORT ANY OF
APPELLANT'S CONVICTIONS ................................................. 23

A.    Standard of review .............................................. 24

B.    The Government's case-in chief was built
      on weak circumstantial evidence and the
      incredulous statements of Appellant's
      former associates .................................................. 25

C.    This Court must acquit Appellant because
      the inferences drawn by the jury were
      irrational, speculative, and insupportable .............. 37

      1.    RICO conspiracy in violation of 18
            U.S.C. § 1962(d) ........................................... 37

            a.    Appellant did not have any
                  common objectives with the TS ............... 39

            b.    No narcotics conspiracies existed
                  within the TS as drug trafficking
                  was a personal choice some TS
                  members made on their own................... 40

            c.    No murder conspiracies existed
                  within the TS as some members
                  went rogue and killed for
                  personal reasons.................................. 42

      2.    Murder in the aid of racketeering in
            violation of 18 U.S.C. § 1959(a)(1) ................. 47

      3.    Conspiracy to commit murder in aid of
            racketeering in violation of 18 U.S.C. §
            1959(a)(5) ..................................................... 51

A GOVERNMENT WITNESS INFRINGED APPELLANT'S
CONSTITUTIONAL RIGHTS WHEN SHE IMPROPERLY
COMMENTED ON APPELLANT'S EVENTUAL ELECTION OF
HIS RIGHT NOT TO TESTIFY ................................................. 53

A.    Standard of review and applicable law ................... 54

      1.    The right to remain silent and not
            testify is fundamental to the notions of
            fair play and justice ..................................... 54

      2.    Motion for mistrial analysis ........................... 55

B.    An FBI Agent becomes frustrated on cross-
      examination and strikes a foul blow against
      the Appellant ......................................................... 56

C.    The record establishes that Agent
      Gutierrez's comment justified a mistrial as
      it had a substantial and injurious effect on
      Appellant's defense ................................................ 59

THE DISTRICT COURT INFRINGED APPELLANT'S
CONSTITUTIONAL RIGHTS BY ALLOWING THE
GOVERNMENT TO ADMIT EVIDENCE OF APPELLANT'S
GANG-AFFILIATED TATTOOS ................................................. 67

A.    The relevant standards of review and
      applicable law ........................................................ 68

      1.    Harmless error standard applies .................... 68

      2.    Relevant legal principles ............................... 69

B.     The Government did not rely on any tattoo evidence to identify the Appellant; but rather, for the content of what was written to prove his TS gang affiliation and participation in the criminal enterprise .................. 71

C.     A new trial is warranted because Appellant was compelled to incriminate himself during trial ........................................................... 73

THE CUMULATIVE EFFECT OF THE ERRORS AT ISSUE SO FATALLY INFECTED APPELLANT'S TRIAL THAT THEY VIOLATED HIS TRIAL'S FUNDAMENTAL FAIRNESS .................... 75

A.     The relevant standards of review and applicable law ...................................................... 75

B.     The synergistic or repetitive effect of the errors at hand undermined the fairness of the underlying proceedings .................................... 76

CONCLUSION ....................................................................... 77

CERTIFICATE OF SERVICE .................................................. 78

CERTIFICATE OF COMPLIANCE .......................................... 79

# TABLE OF CITATIONS (ADD 1)

Page

**U.S. SUPREME COURT CASES**

*Griffin v. California,*
    380 U.S. 609 (1965) ....................................................... 54

*Hibel v. Sixth Judicial Dist. Ct.,*
    542 U.S. 177 (2004) ....................................................... 70

*In re Winship,*
    397 U.S. 358 (1970) ....................................................... 59

*Mullaney v. Wilbur,*
    421 U.S. 684 (1975) ....................................................... 59

*Sandstrom v. Montana,*
    442 U.S. 510 (1979) ....................................................... 59

*United States v. Hubbell,*
    530 U.S. 27 (2000) .................................................... 69,72

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) ................................................. 73,76

**CIRCUIT COURTS OF APPEALS**

*De Luna v. United States,*
    308 F.2d 140 (5th Cir. 1962) ..................................... 54,55

*Gongora v. Quarterman,*
    No. 07-70031, 2008 WL 4656992 (5th Cir.
    Oct. 22, 2008) ............................................................... 60

*Lyda v. United States,*
    321 F.2d 788 (9th Cir. 1963) ........................................ 44

*Madden v. Collins,*
    18 F.3d 304 (5th Cir. 1994).............................................. 60

*United States v. Baldwin,*
    644 F.2d 381 (5th Cir. 1981)........................................ 55

*United States v. Banks,*
    514 F.3d 959 (9th Cir. 2008).................................... 52,53

*United States v. Baresh,*
    790 F.2d 392 (5th Cir. 1986)........................................ 56

*United States v. Basciano,*
    599 F.3d 184 (2d Cir. 2010).......................................... 51

*United States v. Caldwell,*
    586 F.3d 338 (5th Cir. 2009)........................................ 55

*United States v. Concepcion,*
    983 F.2d 369 (2d Cir. 1992).................................... 47,48

*United States v. Daniels,*
    723 F.3d 562 (5th Cir.), *modified in part*
    *on reh'g,* 729 F.3d 496 (5th Cir. 2013) ........................... 24

*United States v. Davis,*
    380 F.3d 821 (5th Cir. 2004)........................................ 24

*United States v. Delgado,*
    672 F.3d 320 (5th Cir. 2012)........................................ 75

*United States v. Driver,*
    535 F.3d 424 (6th Cir. 2008)........................................ 38

*United States v. El–Mezain,*
    664 F.3d 467 (5th Cir. 2011)........................................ 69

*United States v. Erwin,*
    793 F.2d 656 (5th Cir. 1986)...........................................42

*United States v. Fields,*
    483 F .3d 313 (5th Cir. 2007).........................................75

*United States v. Garcia,*
    151 F.3d 1243 (9th Cir. 1998)........................................43

*United States v. Grant,*
    683 F.3d 639 (5th Cir. 2012)..........................................25

*United States v. Greer,*
    631 F.3d 608 (2d Cir. 2011)...........................................70

*United States v. Griffith,*
    118 F.3d 318 (5th Cir. 1997).........................................61

*United States v. Herrera,*
    466 F. App'x 409 (5th Cir. 2012) ...................................38

*United States v. Johnston,*
    127 F.3d 380 (5th Cir. 1997).............54,61,62,63,64,65,66

*United States v. Pool,*
    660 F.2d 547 (5th Cir. Unit B Nov. 1981).......................64

*United States v. Pratt,*
    728 F.3d 463 (5th Cir. 2013)..........................................37

*United States v. Richard,*
    775 F.3d 287 (5th Cir. 2014).........................................69

*United States v. Rojas Alvarez,*
    451 F.3d 320 (5th Cir. 2006)..........................................41

*United States v. Rosenthal,*
    805 F.3d 523 (5th Cir. 2015)..........................................37

11

*United States v. Ruiz*,
860 F.2d 615 (5th Cir. 1988)............................................ 25

*United States v. Sam*,
467 F.3d 857 (5th Cir. 2006).......................................... 24

*United States v. Sanders*,
343 F.3d 511 (5th Cir. 2003).......................................... 69

*United States v. Simon*,
964 F.2d 1082 (11th Cir. 1992)...................................... 59

*United States v. Thai*,
29 F.3d 785 (2nd Cir. 1994)...................................... 49,50

*United States v. Toliver*,
387 F. App'x 406 (4th Cir. 2010) .................................. 70

*United States v. Wharton*,
320 F.3d 526 (5th Cir. 2003).......................................... 55

*United States v. Wilson*,
116 F.3d 1066 (5th Cir. 1997)........................................ 48

## DISTRICT COURT CASES

*United States v. Ledbetter*,
No. 2:14-CR-127, 2016 WL 2956250 (S.D. Ohio
May 23, 2016)............................................................... 70

## RULES & STATUTORY AUTHORITY

18 U.S.C. § 1959.......................................20,47,48,49,51,52,53

18 U.S.C. § 1962............................................................. 20,37

18 U.S.C. § 3742 ...................................................................... 14

28 U.S.C. § 1291 ...................................................................... 14

Fed. R. App. P. 4 ...................................................................... 14

## **STATEMENT OF JURISDICTION**

Jurisdiction of this Court is invoked under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), as an appeal from a final judgment of conviction and sentence in the United States District Court for the Western District of Texas (Del Rio Division) on December 17, 2015.[1] Notice of appeal was timely filed by Sanchez in accordance with Rule 4(b) of the Federal Rules of Appellate Procedure on December 16, 2015. ROA.6725.; *see* FED. R. APP. P. 4(b)(2) ("A notice of appeal filed after the court announces a decision, sentence, or order —but before the entry of the judgment or order — is treated as filed on the date of and after the entry."); *see also* FED. R. APP. P. 4(b)(1)(A) ("In a criminal case, a defendant's notice of appeal must be filed in the district court within 14 days after the later of: (i) the entry of either the judgment or the order being appealed; or (ii) the filing of the government's notice of appeal.").

---

[1] ROA.6731. The record is cited as follows: Official Record "ROA.[page #]."

## <u>STATEMENT OF THE ISSUES</u>

ISSUE ONE:        THERE IS INSUFFICIENT EVIDENCE TO SUPPORT ANY OF APPELLANT'S CONVICTIONS.

ISSUE TWO:        A GOVERNMENT WITNESS INFRINGED APPELLANT'S CONSTITUTIONAL RIGHTS WHEN SHE IMPROPERLY COMMENTED ON APPELLANT'S EVENTUAL ELECTION OF HIS RIGHT NOT TO TESTIFY.

ISSUE THREE:      THE DISTRICT COURT INFRINGED APPELLANT'S CONSTITUTIONAL RIGHTS BY ALLOWING THE GOVERNMENT TO ADMIT EVIDENCE OF APPELLANT'S GANG-AFFILIATED TATTOOS.

ISSUE FOUR:       THE CUMULATIVE EFFECT OF THE ERRORS AT ISSUE SO FATALLY INFECTED APPELLANT'S

**TRIAL THAT THEY VIOLATED HIS TRIAL'S FUNDAMENTAL FAIRNESS.**

## STATEMENT OF THE CASE

### *The Texas Syndicate*

The Texas Syndicate ("TS") was established in the prisons of California in the early 1970s. ROA.7913. The TS, at one time, had a hierarchical command and authority structure, with specifically defined roles for its members. ROA.7555-56, 7562-68, 7571,8659. Its symbols include an intertwined stamp of the letters "T" & "S" ("TS") and anything related to longhorns. ROA.7504, 7752, 7561, 7579, 8633.

The TS operates out of multiple cities within the State of Texas, controlled by separate and distinct chapters and each led by a different TS member called a Sillon. ROA.7563, 7571, 7729, 8830, 9186. The Sillon controlled all TS activity in his chapter, with multiple other members working underneath him in the following order of seniority: Lieutenants; Sergeants; Carnals; and Prospects. ROA.7563, 7571, 7729, 8830, 9186. Within each chapter, particularly within the Uvalde TS,

16

individual members had the freedom to act outside the scope of the chapter to make money for his self in any way the member sought fit, including through the purchase and sale of narcotics. ROA.7739, 7743, 7755. Since drug trafficking was not considered TS business, members did not have to contribute to the group's petty cash or "caja." ROA.8305-07, 8338-39.

Individuals may become TS members either by committing certain acts of violence, ROA.7914-15., or serving in the capacity of a prospect for one to three years. ROA.7915. Sanchez is alleged to be a TS Carnal, while the following individuals carry varying ranks within the TS: Raul Rodriguez, Johnny Rodriguez, Rogelio Mata, Inez Mata, Lucio Soto, Charles Esparaza, Jose Torres, Larry Munoz, and Ervy Sanchez. ROA.7623-27, 7727-32, 7879, 7916, 8274, 8014.

TS members would meet to report happenings within their chapter and vote on various matters as needed. ROA.8297, 7879. Prospects and individuals that were "on

17

status," however, had no authority to vote or attend these meetings. ROA.8279.

### *The Alleged Acts of Murder & Mayhem*

Several violent acts were contemplated or perpetrated by several members of the TS against other TS members or prospects within their group between March 2002 and November 2011. Of primary importance to this appeal is the murder of Rogelio Mata, which occurred over a personal debt he owed for the purchase of cocaine. ROA.7637. Raul Rodriguez and his brother, Johnny, allegedly volunteered to carry out the murder of Mata, who they picked up on the evening of October 13, 2002. ROA.7861, 8911.; ROA.7734, 7919. The next morning, Uvalde Sheriff's Officers found Mata deceased in a grassy ditch along a roadway with multiple gunshot wounds. ROA.7862, 7904, 8755-60.; ROA.8677-84. DNA evidence linked Raul Rodriguez to the crime scene and witnesses identified Johnny Rodriguez as the gunman. ROA.7921, 8754-62, 8764-65, 8911, 9082-88. Raul Rodriguez

and Johnny Rodriguez were later indicted and convicted in connection with Mata's murder. ROA.8892-8932.

Next, on December 23, 2005, Jose Guadalupe De La Garza was murdered outside his home over another personal vendetta relating to a car stereo and a drug debt. ROA.6336, 8032, 8312. Cristobal Velasquez and Mike Cassiano are suspected of carrying out this murder. ROA.6336. De La Garza's death was followed by Ervy Sanchez's killing of Prospect Jesse Polanco in November 2009. ROA.8033.

### *Appellant Is Indicted for RICO Conspiracy and VICAR Offenses & Sentenced to Two Terms of Life Imprisonment*

In September 2011, Sanchez and others were indicted for the above-described criminal activity. ROA.5929. A Superseding Indictment was filed against Sanchez on August 7, 2013, ROA.6326., followed by a Second Superseding Indictment on November 13, 2013. ROA.6413. The three-count Second Superseding Indictment alleged that the TS was a criminal organization that engaged in widespread criminal activity, including drug trafficking and murders, constituting a pattern of racketeering activity. Specifically, Sanchez was

charged with one count of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d) (Count One). ROA.6413. Sanchez's charge arose out of alleged acts of murder and narcotics distribution. ROA.6422-34. The Second Superseding Indictment, in addition to the RICO conspiracy charge, charged Sanchez with one count of violating the Violent Crimes in Aid of Racketeering Activity Act ("VICAR"), 18 U.S.C. § 1959(a)(1), based on the murder of Rogelio Mata, (Count Three). ROA.6434-35. Sanchez was also charged with a second VICAR count under 18 U.S.C. § 1959(a)(5) based on conspiracy to commit the murder of Rogelio Mata (Count Two). ROA.6434-35.

While several defendants chose to plead guilty, Sanchez and others maintained their innocence and elected to exercise their right to a trial by jury. Although Sanchez was initially tried with his alleged co-defendants, he was granted a new trial during the middle of the proceedings after a "conflict" arose during his joint trial. ROA.7318. Sanchez later

proceeded to a week-long jury trial separate from his codefendants. ROA.7494.

After the Government had concluded its case-in-chief in Sanchez's trial, the parties rested and the case submitted to the jury. Sanchez was convicted on all counts as charged in the Second Superseding Indictment. ROA.6712. After the jury found Sanchez guilty of the charged offenses, the District Court sentenced Sanchez to a term of life imprisonment on each of Counts One and Three and a term of 120-months imprisonment on Count Two. ROA.6732. In addition, the Court ordered the terms of Sanchez's imprisonment to be followed by concurrent five and three year terms of supervised release, a $3,000 fine, and $300 in special assessments. ROA.6733-37. Sanchez timely perfected his appeal to this Honorable Court after the District Court's entry of its judgment. ROA.6725.

## SUMMARY OF THE ARGUMENT

The Government's case against Sanchez hinged on evidence that required jurors to make speculative leaps to

reach its conclusion that Sanchez had any connection to the charged misconduct. The inferences drawn by the jury are without sufficient evidentiary foundation and Sanchez was thus entitled to a judgment of acquittal.

To make matters worse, the judicial proceedings against Sanchez were fundamentally flawed from the beginning. Sanchez was denied a fair trial below in that a prosecutorial witness flagrantly commented on Sanchez's eventual assertion of his right not to testify. The Government's witness remarked to the jury that Sanchez should "get up here and testify" in response to a question posed to her. The District Court failed to take the necessary steps to protect Sanchez's rights in response to the witness's statement, including granting him a mistrial due to the egregiousness of the witness's conduct.

Not only that, the Government relied on photographs of Sanchez's gang-affiliated tattoos that were not plainly visible on his body to establish Sanchez's involvement in the charged crimes. The tattoo evidence involved testimonial self-incrimination in violation of Sanchez's Fifth Amendment

rights. The District Court plainly erred by permitting the introduction of the evidence to the jury and the case must be retried without such improper evidence.

Accordingly, Sanchez respectfully requests this Court to vacate his convictions and to enter a judgment of acquittal as to each offense. Sanchez, alternatively, asks this Court to reverse his convictions due to the repeated infringement of his constitutional rights and to remand the case to the District Court for a new trial.

## ARGUMENT[2]

**ISSUE ONE:    THERE IS INSUFFICIENT EVIDENCE TO SUPPORT ANY OF APPELLANT'S CONVICTIONS.**

The evidence presented against Sanchez is far from compelling, consisting of largely circumstantial evidence of guilt. Little, if any, evidence links Sanchez to the charged offenses despite over a dozen witnesses testifying against him. Sanchez was convicted by the jury without sufficient basis to support his convictions, and this Court should vacate

---

[2] Pursuant to Federal Rule of Appellate Procedure 28(i), Sanchez adopts by reference the legal authorities and arguments of his co-appellants to the extent such matters may be reasonably extended to his case as well.

Sanchez's convictions and render a judgment of acquittal as to all counts.

## A.    Standard of review

A defendant must timely move for a judgment of acquittal to preserve a sufficiency complaint for appellate review. *See United States v. Sam*, 467 F.3d 857, 860 (5th Cir. 2006). This Court has recognized that a defendant who moves for a judgment of acquittal at the close of the Government's evidence and presents no evidence following the denial of his motion for acquittal preserves his objection to the sufficiency of the evidence supporting his convictions. *United States v. Daniels*, 723 F.3d 562, 569 n. 13 (5th Cir.), *modified in part on reh'g*, 729 F.3d 496 (5th Cir. 2013); *United States v. Davis*, 380 F.3d 821, 827 (5th Cir. 2004).

"The usual standard applied when insufficiency of evidence to support a conviction is raised is whether, viewing the evidence presented and all inferences reasonably drawn therefrom in the light most favorable to the government, any rational trier of fact properly could have found each element of

the crime beyond a reasonable doubt*." United States v. Ruiz*, 860 F.2d 615, 617 (5th Cir. 1988). "The jury retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012). In order to be sufficient, "'[t]he evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.'" *Id.* (internal quotation marks and citation omitted).

**B.    The Government's case-in chief was built on weak circumstantial evidence and the incredulous statements of Appellant's former associates**

Sanchez's convictions are tied to allegations of murder, particularly, Rogelio Mata, and the alleged distribution of narcotics by Sanchez and his TS associates. The Government's case against Sanchez was built on the testimony of multiple law enforcement witnesses and the testimony of various members or former associates of the TS. None of which is sufficient to allow a rational trier of fact to have found each element of the crimes charged beyond a reasonable doubt.

Special Agent Martin Martinez testified that he participated in the arrests of TS members in September 2011, ROA.7500-03, 7518. He discussed various items of property seized during the arrests, but did not provide any direct testimony as to Sanchez.

Agent Steve Hause served as the Government's gang expert, providing general background testimony about the TS and describing how the TS had different chapters in various cities. ROA.7571. He also explained how he believes the TS gains income from the narcotics trade, ROA.7535, 7541, 7599, 7571, 7591., including how it charges individuals outside the organization a $200 tax or cut for selling narcotics within their territory. ROA.7570. Like Agent Martinez, Agent Hause did not provide any testimony directly linking Sanchez to any illegal activities.

Special Agent Steve Collender, an agent with the white collar unit, testified he executed the search of the residence where Sanchez was located during the investigation. ROA.7522-24. He stated about five or six individuals,

26

including Sanchez, were at the residence at the time of the search warrant execution. ROA.7531. Although agents looked for contraband and weapons at the residence, they only found clothing items bearing what Agent Collender believed to bear the TS insignia. ROA.7525-26. Agent Collendar, however, could not determine who in the residence these clothing items belonged. ROA.7533-34. Thus, Agent Collendar did not know whether the clothing items at the residence belonged to Sanchez or someone else at the residence. ROA.7533-34.

Lucio Soto, a former member of the San Antonio branch of the TS, testified he supplied cocaine to the Sillon of the San Antonio TS. ROA.7623-27. Soto stated this Sillon then sold the cocaine to his TS brothers, including Rogelio Mata. ROA.7623-27. He noted that the San Antonio branch of the TS eventually had to meet several times to talk about Mata when Mata stopped making payments for his drugs. ROA.7629, 7630, 7638. Soto testified he eventually learned that the Uvalde chapter of the TS had taken care of Mata through Uvalde TS member Raul Rodriguez. ROA.7637-40, 7645. He admitted he

did he know anything about Sanchez other than the fact that Sanchez is also a member of the TS. ROA.7651-52, 7656.

Inez Mata,[3] a former TS member with the Uvalde chapter, testified Raul Rodriguez, Rogelio Mata, and Sanchez are all members of the TS. ROA.7727-32. He testified that the Uvalde branch of the TS had met and voted to order the murder of Rogelio Mata due to a personal grudge against him by some members relating to the mishandling of a drug debt. ROA.7733, 7739, 7794-95, 7813-16. Inez explained that ordering Rogelio's murder for such personal reasons was strictly against TS procedure, as murders were only justified for matters directly relating to TS business, which this was not one of them. ROA.7739.

He recalled that after the vote, Raul Rodriguez and his brother, Johnny, who were in attendance at the meeting, volunteered to carry out the murder of Rogelio. ROA.7734, 7738, 7794. Although Inez initially testified that he was the only TS member to vote against the murder of his cousin,

---

[3] Inez Mata did not personally testify at trial; instead, FBI Agent Rubon McVay read Inez's testimony from a prior proceeding to the jury as well as a subsequent death-bed deposition made by Inez. ROA.7725, 7790.

Rogelio, ROA.7734., he later retracted such testimony. ROA.7794-97. Specifically, Inez later testified that he "*don't remember*" if Sanchez was one of the members voting in favor of Rogelio's murder. ROA.7796 (emphasis added). Inez explained that he, in fact, did not recall Sanchez ever voting in favor of any murders whatsoever. ROA.7784-85.

As for the TS view on narcotics trafficking, Inez testified the TS did not prohibit individual members from selling drugs. ROA.7739, 7743, 7755. Inez stated "everybody did their thing . . . you want to sell drugs, you sell drugs." ROA.7739, 7743, 7755. He emphasized that individual members worked for themselves when it came to narcotics trafficking, as opposed to for the TS itself. ROA.7739, 7743, 7755, 7801. TS members were thus able to personally profit from their drugs transactions. ROA.7739, 7743, 7755, 7801.

Charles Esparza testified he was "on status" at the time of the meeting to vote to murder Rogelio Mata. ROA.7879. Although Esparaza admitted that TS rules expressly prohibited individuals, like him, who were "on status" from attending the

meeting, he nonetheless testified that he observed the vote to murder Rogelio. ROA.7854-55, 7879-80. Unlike Inez Mata's death-bed testimony, Esparaza incredibly reported that "everybody," voted to murder Rogelio - even Rogelio's cousin Inez. ROA.7854-55.

As for his relationship with Sanchez, Esparza told the jury he met Sanchez dozens of times. ROA.7885-88. Yet, just prior to the underlying proceeding, it was revealed to the jury that Esparaza had given sworn testimony to the contrary by stating that he had only met Sanchez once. ROA.7885-88. Esparza further testified he believed Sanchez's source of personal income was derived from the selling of narcotics. ROA.7863.

Jose Torres, a former TS Sillon, testified he knows Sanchez and remembers that Sanchez became a full member carnal of the TS sometime before he did around 2003, but could not provide a precise date as to the event. ROA.7916. He acknowledged that he knew Sanchez, ROA.7915-16, but could not provide any details about Sanchez's role, if any, in the vote

and murder of Rogelio Mata or any other people because Torres was incarcerated at that time the events occurred. ROA.7918-20, 7921-22.[4]

Larry Munoz, a TS member, testified he was incarcerated at the time Rogelio Mata was murdered in 2002; therefore, he could not testify about the incident. ROA.8274, 8298, 8323. Similarly, he did not know any details about the murder of Jesse Polanco because he was incarcerated at the time of that murder too. ROA.8323. As for Ramon "Spider" Rodriguez, Munoz stated the Uvalde TS never voted to murder him. ROA.8329-30.

As for the murder of De La Garza, Munoz believed it was a personal matter and not related to TS business. ROA.8312. Although Munoz identified multiple individuals he believed were responsible for De La Garza's murder, Sanchez was not one of those individuals ROA.8311-13, 8319-20. Munoz

---

[4] Torres did recall a meeting on August 14, 2010 attended by Sanchez and the other TS members discussing what to do about an individual known as Ramon "Spider" Rodriguez. ROA.7926-28, 7943-44. Although the topic of the meeting was purportedly to discuss whether to murder Spider, Torres confirmed that no vote to murder Spider ever occurred. ROA.7928, 7944.

further told the jury that Sanchez was incarcerated from around 2006 until 2010. ROA.8322.

On the topic of narcotics, Munoz informed the jury that individual TS members were permitted to sell drugs because trafficking drugs was not considered TS business. ROA.8307-09, 8335. According to Munoz, selling drugs was a personal choice of the individual member; therefore, individual members had no obligation to share their drug proceeds with the TS. ROA.8338-39.

When asked about the notations in a ledger he kept identifying Sanchez as a "rep" for the TS, Munoz told the jury that a "rep" serves as an intermediary between the TS and outside organizations. ROA.8303-04, 8337. In other words, the rep speaks on behalf of the TS to other organizations/individuals when issues arise between them. ROA.8303-04, 8337. He confirmed that a "rep" has nothing to do with narcotics or narcotics distribution. ROA.8337. Munoz testified he has never observed Sanchez engage in any narcotics trafficking activities. ROA.8323.

Munoz testified that individuals who are "on status" cannot participate in any TS matters during their "on status" period. ROA.8297. He also stated he believed the Uvalde TS had become disorganized by August 2010, as "everybody was doing their own thing." ROA.8305-07. Munoz stated that he wanted to fix things within the Uvalde TS and get members following TS procedures once again. ROA.8305-07.; ROA.8338-39. (stating multiple rules that original TS members created are no longer followed and that no rules requiring members to contribute to the "caja" for the financial well-being of the group were no longer applicable). He also stated that he spoke to Sanchez in the past about the problems within the Uvalde TS because individuals were "bringing unnecessary heat" to the group by committing random acts of violence that reflected negatively on the rest of the members. ROA.8333-34.

Ervy Sanchez, who did not gain his membership into the TS until 2011, testified at trial as well. ROA.8014. Ervy stated George Sanchez sold cocaine to make his income. ROA.8028, 8035-37, 8043-45. He stated prospects are not brought into

the inner workings of the TS until they become full member carnals. *See* ROA.8018. (reflecting prospects only given the five most basic rules of the TS and that only upon achieving full carnal status does a member receive the rest of the TS's rules). Ervy stated that many TS members personally made money from selling drugs, ROA.8029., and confirmed that no members contributed any of their personal drugs proceeds back to the TS as evidenced by the group's empty petty cash box. ROA.8029. (showing group's petty cash box, *i.e.*, the caja, was empty when he was involved with the TS). When asked about George Sanchez's "rep" position with the TS, Ervy stated he believed it meant George had control over the drugs coming into the TS despite what Munoz had stated about Sanchez's role. ROA.8030-31.

Ervy stated that he murdered Jesse Polanco, ROA.8033., and believes other TS members murdered Jose Guadalupe De La Garza in 2005 over a personal debt regarding a stereo and drugs. ROA.8031-33. He neither provided affirmative statements indicating that George Sanchez played any role in

the murders of Polanco or De La Garza, nor stated that Sanchez participated in any votes to approve such murders. ROA.8033-34.

Orlando Guerrero and Eliseo Garcia also testified against Sanchez. ROA.7949, 7996. Guerrero testified has purchased drugs from Sanchez in the past, ROA.7950, 7954-55., while Garcia confirmed that he too had purchased narcotics on and off from Sanchez for a six-month period. ROA.8001.

Because the remaining trial witnesses provided no circumstantial or direct evidence connecting Sanchez to the charged misconduct, the undersigned summarizes such testimony in bullet form:

• A Sheriff from the Uvalde County Sheriff's Office, Armando Garcia, testified at trial concerning the discovery of Rogelio Mata's body in October 2002 and provided no evidence linking Sanchez to the crime. ROA.7903-04, 7911.

• A Uvalde Police Officer, Daniel Rodriguez, stated he went to school with Sanchez, but provided no testimony linking Sanchez to any crimes. ROA.7986, 7995.

• David Cabrera, a Texas Department of Public Safety Officer, testified about various investigations of gang murders in Uvalde, Texas between 2005 and 2013. ROA.8085-86. He stated he had a confidential source inside the TS, but did not identify this source for the jury. ROA.8088, 8102, 8106.

• Randal Frost, Chief Medical Examiner, provided autopsy testimony related to the case, but provided no testimony linking Sanchez to the homicides he investigated. ROA.8119, 8126, 8137-50.

• Carmen Valdez, a FBI linguist, testified about the evidence she translated for the case. ROA.8193-95.

• Jody Koehler and Richard Fout, crime lab analysts, testified about the DNA and other testing in the case. ROA.8232-41, 8249. Neither witness connected Sanchez to any criminal misconduct.

• Katherine Gutierrez, an FBI agent, testified about the use of wiretaps during the underlying investigation. ROA.8344-47.

**C.    This Court must acquit Appellant because the inferences drawn by the jury were irrational, speculative, and unsupportable**

### 1.    <u>RICO conspiracy in violation of 18 U.S.C. § 1962(d)</u>

Under 18 U.S.C. § 1962(c), it is a crime for "any person employed by or associated with any enterprise engaged in, [or affecting] interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1962(d), at issue here, prohibits conspiracy to violate any part of § 1962. *United States v. Rosenthal*, 805 F.3d 523, 530 (5th Cir. 2015). "The elements of a conspiracy under § 1962(d) are simply (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *United States v. Pratt*, 728 F.3d 463, 477 (5th Cir. 2013).

In addition to these elements, in accordance with the instruction submitted to the jury, ROA.6664-6667, 6712., the Government also had to establish the defendant agreed that

someone, not necessarily the defendant, would commit two predicate acts constituting a pattern of racketeering activity. ROA.6667. (jury instruction stating "Count One of the indictment accuses the defendant of conspiring to engage in a pattern of racketeering activity. Only if the government proves the defendant agreed that either he or one of his co-conspirators should commit at least two distinct racketeering activities can the government prove the RICO conspiracy charged in Count One."); *see, e.g., United States v. Driver*, 535 F.3d 424, 432 (6th Cir. 2008) (explaining "[a defendant]'s RICO conspiracy conviction can be sustained [only] if there is evidence sufficient to prove that [defendant] agreed that someone would commit two predicate acts"). The government may establish the aforementioned elements with circumstantial evidence. *United States v. Herrera*, 466 F. App'x 409, 420 (5th Cir. 2012) (not designated for publication).

Here, the record evidence is inadequate to show that Sanchez knew of and agreed to the overall objective of the RICO offense or that he agreed to committing (or having

someone engage) in the two predicate acts constituting a pattern of racketeering activity as found by the jury. ROA.6712-13. (jury finding that Sanchez conspired to engage in the two following kinds of racketeering activities: conspiracy to commit murder and conspiracy to distribute controlled substances).

### a.  *Appellant did not have any common objectives with the TS*

There is no evidence showing Sanchez agreed to the Texas Syndicate's objectives because the Uvalde TS had no continuing common purpose at the time of his alleged membership. The jury heard that the Uvalde chapter of the TS was in disarray and completely disorganized. ROA.8305-07, 8338-39. Although the founding members of TS had formulated strict rules and procedures for the TS to follow, the Uvalde TS operated on its own accord and failed to adhere to previously established customs and standards. ROA.8305-07, 8338-39. (showing original rules of TS no longer followed by Uvalde TS). Members simply "did their own thing," ROA.8305-07; ROA.7739, 7743, 7755, which motivated some members

like, Munoz, to discuss making changes to bring organization and discipline back to the TS. ROA.8333-34. Given the lack of cohesion within the Uvalde TS, the Uvalde TS had no common goals or purposes. As such, Sanchez could not have known or agreed to the overall objective of the RICO offense because the Uvalde TS had no clear agendas and acted sporadically, making the TS's acts unrelated to Sanchez and his own goals.

### b. *No narcotics conspiracies existed within the TS as drug trafficking was a personal choice some TS members made on their own*

There is also insufficient evidence showing that any TS members actually committed drug trafficking acts in their capacities as members of the TS. The record confirms that narcotics trafficking within the TS was an independent venture of some of the members and not sufficiently related to the affairs of TS to constitute a predicate act. Nearly every witness the Government put on the stand at trial emphasized that they and others within the Uvalde TS sold drugs for themselves only. ROA.7739, 7743, 7755, 7801; ROA.8307-09, 8335. They testified that those members involved with the sale of drugs

had no obligation to share any of their drug proceeds with the Uvalde TS. ROA.8338-39.; ROA.8029. (showing TS petty cash box, the caja, was empty because no members had to share their profits with the group).

As for Sanchez, there is nothing to suggest he ever agreed to participate in a larger drug conspiracy as he was only involved in his own ordinary buy/sell drug transactions. The testimony at trial consistently shows Sanchez engaged in his own drug dealings outside the TS for his own personal gain. To the extent that the jury heard Ervy Sanchez state that George Sanchez held a "drug rep" position within the TS structure, such testimony amounts to no evidence as it is pure speculation on the part of witness. ROA.8030-31.; *United States v. Rojas Alvarez,* 451 F.3d 320, 333-34 (5th Cir. 2006) ("[A] verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference."). When Ervy testified, he was referring to notations within a Government exhibit drafted by another TS member that identified Sanchez as "rep." However, the author of the

"rep" connotation, Munoz, fully explained to the jury that the term "rep" had nothing to do with narcotics distribution. ROA.8303-04, 8337. Instead, the phrase "rep" indicated that Sanchez served as the intermediary between the TS and outside organizations/individuals when various issues arose between them. ROA.8303-04, 8337.

The only reasonable inference allowed by the evidence is that Sanchez did not facilitate, participate, or otherwise agree to engage in a drug conspiracy of any sort. Selling controlled substances in no way furthered the affairs and operations of the TS, and the Government failed to prove the predicate act. *See generally United States v. Erwin*, 793 F.2d 656, 671 (5th Cir. 1986).

    **c.**    ***No murder conspiracies existed within the TS as some members went rogue and killed for personal reasons***

Sanchez further had no knowledge that any of his alleged coconspirators might commit the murder of Rogelio Mata, De La Garza, or Polanco. There is simply no evidence demonstrating Sanchez was involved in the affairs that led to

the demise of Rogelio Mata, De la Garza, or Polanco. It appears the jury improperly found Sanchez guilty merely due to his gang affiliation. *See United States v. Garcia*, 151 F.3d 1243, 1246 (9th Cir. 1998) (stating mere gang membership "cannot itself prove that an individual has entered an agreement to attack members of rival gangs."). Sanchez simply had no knowledge that any of his alleged coconspirators might commit murder.

The record confirms that individuals cannot be involved in the decisions of the TS while they are incarcerated, on status, or merely a prospect. ROA.7926-27, 8018, 8297. At the time the decision to murder Mata was made, Sanchez appears to have been just a TS prospect. ROA.7916. (showing that Sanchez gained his membership status as late as 2003). As such, he could not have aided, encouraged, solicited, or conspired to commit Mata's murder because he had no decision making authority within the TS as a prospect.

Alternatively, even if Sanchez was deemed a full member at the time of Mata's demise, the record does not establish

beyond a reasonable doubt that (a) Sanchez participated in the vote to murder Mata or (b) the murder constituted TS business to which he can be held accountable. ROA.7651-52, 7656. Inez Mata, whose impending death guaranteed the trustworthiness of the statements he gave during his deposition testimony for the jury, consistently testified Rogelio Mata's murder was over a personal grudge and not TS business. ROA.7733, 7739, 7794-95, 7813-16.

The jury was further unable to infer from the Government's evidence that Sanchez even cast a vote as to the murder of Mata. Inez provided compelling testimony, while facing his impending death, that he did not recall Sanchez voting in favor of Mata or to kill any other person for that matter. RAO.7784-85. The only witness that placed Sanchez at the meeting where some people voted to kill Mata was Esparaza, whose testimony is facially incredible in light of the record evidence as a whole. ROA.7854-55.; *see Lyda v. United States*, 321 F.2d 788, 795 (9th Cir. 1963) (acknowledging a conviction may be based on the uncorroborated testimony of a

single accomplice, *so long as it has not reached "a point when the witness' qualifications are so shoddy that a verdict of acquittal should have been directed.*") (emphasis added).

Esparaza admitted he was "on status" at the time of the meeting to decide Mata's fate. ROA.7879. Multiple witnesses verified at trial, however, that individuals "on status" had no ability to observe or participate in the decisions of the TS, like voting for a murder. ROA.8297. Esparaza's implications as to Sanchez's guilt are thus facially incredible and no evidence to support the jury's verdict.

Similarly, the murders of De La Garza and Polanco cannot be attributed to Sanchez in any way. With respect to De La Garza's murder, Sanchez was incarcerated for another offense at the time of De La Garza's death. ROA.8322. (indicating Sanchez was incarcerated from around 2006 until 2010); *see also* ROA.9285. (confirming Sanchez was sentenced to serve six years imprisonment for being a felon in possession of a firearm on 9-29-03). Nor is there any evidence in the record suggesting he conspired from his prison cell to get

someone on the outside to carry out their homicides. In any event, the jury heard that De La Garza's murder was nothing more than a personal grudge and not in furtherance of TS business so as falling outside the conspiratorial act. ROA.8312.; ROA.8030-31. As for Polanco, once again there is no evidence Sanchez attended any meetings or cast any votes concerning Polanco's murder. ROA.8311-13, 8319-20, 8033-34.

To the extent that the jury also heard that TS members held a meeting to consider what to do about an individual named Ramon "Spider" Rodriguez, such evidence similarly constitutes no proof of any agreement by Sanchez to conspire to commit murder. All witnesses testifying about Spider stated that no vote ever occurred as to how to address Spider's fate. ROA.7926-28, 7943-44.; ROA.8329-30. Such testimony thus allows no inferences to support the jury's verdict as to Count One. In sum, the Government failed to prove Sanchez is guilty of the RICO conspiracy as charged and Sanchez's conviction as to Count One must be vacated.

## 2.    Murder in the aid of racketeering in violation of 18 U.S.C. § 1959(a)(1)

Count Three charged Sanchez with murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1). ROA.6348. Section 1959(a) provides, in pertinent part, that "[w]hoever, . . . for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity, murders . . . any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—(1) for murder, by death or life imprisonment, or a fine under this title, or both." 18 U.S.C. § 1959(a)(1). To convict a defendant of such a murder, the [G]overnment must prove beyond a reasonable doubt (1) that the organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that that defendant committed the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise. *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992). In determining whether a

murder was carried out "for the purpose of . . . maintaining or increasing position in a[ ] [racketeering] enterprise," 18 U.S.C. § 1959(a), "[s]elf-promotion need not be  the defendant's sole or primary concern; rather, Congress intended to proscribe violent acts committed 'as an integral aspect of membership in such enterprises.' " *United States v. Wilson*, 116 F.3d 1066, 1078 (5th Cir. 1997). The motive requirement is thus satisfied if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Concepcion*, 983 F.2d at 381.

As a preliminary matter, the Government failed to prove beyond a reasonable doubt that Sanchez was even a legitimate member of the TS at the time of the vote to kill Mata. Rogelio Mata was murdered in October 2002, and the only testimony the jury heard addressing Sanchez's full acceptance into the TS was that it occurred sometime before Torres became a carnal in 2003. ROA.7916. Such evidence requires too great

an inferential leap from the jury to conclude Sanchez was actually a fully fledged TS member, with voting rights, at the time of Mata's death. The evidence is, therefore, insufficient.

In any event, there is no evidence that Sanchez committed any voluntary act to bring about the demise of Rogelio Mata or that he shared the intent to commit his murder. Further, the record is devoid of any evidence confirming Mata's murder was committed, at least in part, for the purpose of maintaining or increasing Sanchez's status with the TS enterprise. Mata's death was repeatedly characterized at trial as a personal grudge by another TS member as opposed to legitimate TS business. ROA.7733, 7739, 7794-95, 7813-16. Sanchez thus had neither anything to gain nor to lose by the carrying out of Mata's death.

In *United States v. Thai*, 29 F.3d 785, 818-19 (2nd Cir. 1994), the Court set aside a conviction under 18 U.S.C. § 1959 where the only evidence presented to the jury was that the motive for the violent act at issue was "purely mercenary." The defendant, a gang leader, was offered $10,000 to bomb a

building; in attempting to execute his plan, the gang leader employed fellow gang members. *Thai*, 29 F.3d at 818. The Government's defense of the sufficiency of its evidence to support the conviction focused principally on the proposition that the crime "was part of [the gang's] criminal affairs." *Thai*, 29 F.3d at 818. The Government argued that since "[t]he gang's purpose was to earn money by committing crimes of violence against Asians," the jury could thus properly "find that this crime, like all the others, was intended to maintain and enhance the appellant's role in the charged enterprise— the leader of a violent gang that victimized Asians for profit." *Id.* The Court of Appeals, however, rejected the Government's argument, explaining the convictions "may not be affirmed where, as here, that inference is based on no more than guesswork." *Id.* at 819.

Like *Thai*, the Government's theory at trial was the Mata's murder was simply part of TS's criminal affairs. There is no testimony implicating a motive of the sort envisioned by § 1959 as all signs point to a personal motivation for the

murder. There is no evidence, for example, that the murder was to be a response to any threat to the TS organization or to Sanchez's position. Nor any evidence that Sanchez felt compelled to vote in favor of such murder to advance the standing of the Uvalde TS. Accordingly, this Court should vacate Sanchez's conviction under Count Three.

### 3.    <u>Conspiracy to commit murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5)</u>

Sanchez was also convicted by the jury of conspiring to commit the murder of Rogelio Mata in the aid of TS's alleged racketeering activities. To prove that Sanchez violated 18 U.S.C. § 1959(a)(5), the Government had to establish that Sanchez conspired with others to commit the murder of Rogelio Mata "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a)(5); *see United States v. Basciano*, 599 F.3d 184, 198–99 (2d Cir. 2010).

As with the § 1959(a)(1) count,[5] the record is devoid of evidence that Sanchez assisted in the commission of the § 1959(a)(5) offense, promoted it, or agreed for anyone else in the TS to shoot Rogelio Mata. The circumstances of Rogelio Mata's death did not allow the jury to find that Sanchez agreed to Mata's murder for the purpose of maintaining his position in the TS. The VICAR statute does not extend "to any violent behavior by a gang member under the presumption that such individuals are always motivated, at least in part, by their desire to maintain their status within the gang[.]" *United States v. Banks*, 514 F.3d 959, 968 (9th Cir. 2008). Otherwise, in gang cases, the purpose element would be nearly a tautology. Nor is it enough if the defendant's gang-related purpose was "merely incidental" to his action. *Id.* at 968-69.

The only explanation provided to the jury for Rogelio Mata's death was that it was motivated by personal animosity and the satisfaction of a personal debt as opposed to legitimate TS business. Thus, the jury appears to have focused on

---

[5] Appellant incorporates by reference his arguments from § 1959(a)(1) to support his Rico conspiracy and § 1959(a)(5) challenges and vice versa.

Sanchez's status as a gang member in determining his guilt as opposed to the purpose for the crime. *United States v. Banks*, 514 F.3d 959, 969 (9th Cir. 2008) ("Murder while a gang member is not necessarily a murder for the purpose of maintaining or increasing position in a gang, even if it would have the effect of maintaining or increasing position in a gang."). The jury heard no testimony indicating Mata's death was tied to the purpose promoting the respect or the goals of the TS; thus, the murder was in no way integral to Sanchez's membership in the TS. This Court must therefore set aside Sanchez's § 1959(a)(5) conviction as well.

**ISSUE TWO:     A GOVERNMENT WITNESS INFRINGED APPELLANT'S CONSTITUTIONAL RIGHTS WHEN SHE IMPROPERLY COMMENTED ON APPELLANT'S EVENTUAL ELECTION OF HIS RIGHT NOT TO TESTIFY.**

A Government witness answered a question posed on cross examination in a way that implicated Sanchez's eventual decision not to testify. The witness's response seriously impugned the fairness of the underlying proceedings in that it encouraged the jury to use the defendant's exercise of the right

not testify against him. Sanchez's convictions must therefore be vacated and the cause remanded to the District Court for a new trial.

## A.  Standard of review and applicable law

### 1.  <u>The right to remain silent and not testify is fundamental to the notions of fair play and justice</u>

"Our system of justice rigorously guards the right of an accused to remain silent and not to testify." *United States v. Johnston,* 127 F.3d 380, 398 (5th Cir. 1997). An accused in a criminal trial thus has an absolute right to silence, should he exercise the option, carrying complete freedom from adverse comment and from harmful presumptions (and inferences) based on assertion of the right. *De Luna v. United States*, 308 F.2d 140, 151 (5th Cir. 1962). As recognized by the United States Supreme Court, the Fifth Amendment strictly prohibits "direct and indirect references to a defendant's silence," failure to testify, or produce evidence during the course of a defendant's trial. *Griffin v. California*, 380 U.S. 609, 614 (1965) (holding the Fifth Amendment forbids comments at trial

implicating the accused's refusal to testify, because it would impermissibly burden the exercise of the privilege against self-incrimination, "cut[ting] down on the privilege by making its assertion costly."); *United States v. Wharton*, 320 F.3d 526, 538 (5th Cir. 2003).

In examining whether the integrity of this right has been violated, it is irrelevant who voiced the improper comment. *See, e.g., De Luna*, 308 F.2d at 152. This is because the impropriety of the remark stems not from the role of the speaker, but from the effect on the jury. *Id.*

## 2.   Motion for mistrial analysis

A district court's refusal to grant a mistrial motion is reviewed under an abuse of discretion standard. *United States v. Baldwin*, 644 F.2d 381, 385 (5th Cir. 1981). A lower court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the evidence. *United States v. Caldwell*, 586 F.3d 338, 341 (5th Cir. 2009). Where prejudicial testimony is at issue, reversible error exists if the statements, when viewed in the context of

the whole trial, are so highly prejudicial that it would have had a substantial impact on the jurors' verdict. *See United States v. Baresh*, 790 F.2d 392, 402 (5th Cir. 1986).

## B.    An FBI Agent becomes frustrated on cross-examination and strikes a foul blow against the Appellant

During defense counsel's cross-examination of Special Agent Katherine Gutierrez regarding transcripts from wiretaps made during the course of the TS investigation, the following occurred:

> <u>Defense Counsel</u>: In 61-A, you mentioned that "Bug Bug" means actually "Buck Buck."
>
> <u>Witness</u>: He asked me what I heard, and I told him I heard "Buck Buck. . . .
>
> <u>Defense Counsel</u>: But the sound was Bug Bug.
>
> <u>Witness</u>: No, that's what she put on hers, as she said she phonetically heard.
>
> <u>Defense Counsel</u>: So you're in disagreement with the – Ms. Galvez, I believe, right?
>
> <u>Witness</u>: She put down that it was phonetically "Bug Bug." He asked me

what I heard and what I believed it was discussing, and I said Buck.

Defense Counsel: Okay.  So the question is: There's a disagreement between Ms. Galvez and . . . your testimony?

\*\*\*

Witness: Yes, sir.

Defense Counsel: Okay. But is that the nickname of a person or . . .

Witness: I – I –like I said, I do not know that person's full name.

\*\*\*

Defense Counsel: Well, is the nickname "Buck Buck," I mean, twice?

Witness: I don't know. I don't know the individual. I'm telling you I don't know –

Defense Counsel: Okay.

Witness: –regarding an individual named Buck or nicknamed Buck. I'm not sure which it is because I don't know the true identity of the individual.

\*\*\*

Witness: **I guess your client can get up here and testify. I don't know. . . .**

ROA.8365-67.

Agent Gutierrez's improper spotlighting of Sanchez's need to testify to clarify her testimony caught everyone in the courtroom by surprise, including the District Court: **"Huh-uh, Ms. Gutierrez, No, Ms. Gutierrez. That will be stricken. No."** ROA.8367.; *see also* ROA.8478. (District Court advising Government "that doesn't allow an agent to get up and say, Your client can take the stand and explain it."); ROA.8478. (AUSA acknowledging "I'm not trying to negate it or suggest that [the comment] was proper in any way.").

The record demonstrates that defense counsel did not immediately object to Agent Gutierrez's remark, waiting until a later point in the proceeding to express his concerns with the agent's assertion and to request a mistrial. ROA.8474-75. The District Court explained on the record that Defense Counsel did not need to object to Agent Gutierrez's comment due to the egregiousness nature of it, stating: "And you don't even have to object" . . . "and things like that, y'all don't even need to object. I'm going to stop it because t'aint fair." ROA.8474. While the Court noted that no objection was required from Defense

Counsel, it denied Counsel's request for a mistrial because it did not believe the incident was "sufficient" to mandate a mistrial. ROA.8475.

## C. The record establishes that Agent Gutierrez's comment justified a mistrial as it had a substantial and injurious effect on Appellant's defense

In her apparent frustration with Defense Counsel's line of questioning, Agent Gutierrez decided to "strike at the jugular" of the defendant and impair his defense. Agent Gutierrez's conduct constituted an improper attempt to shift the burden of proof to Sanchez to provide clarification as to her testimony. It is well-settled, however, that a defendant does not have to disprove anything nor prove his innocence in a criminal proceeding. *See In re Winship*, 397 U.S. 358, 364 (1970); *see also Sandstrom v. Montana*, 442 U.S. 510, 524 (1979); *Mullaney v. Wilbur*, 421 U.S. 684 (1975). In other words, the Government has the burden of proving every element of the charged offense beyond a reasonable doubt. *Winship*, 397 U.S. at 364; *see also United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992) ("the Supreme Court has held that a

defendant does not have to disprove anything nor prove innocence, and state-created presumptions to the contrary are violative of due process").

Second, Agent Gutierrez effectively disparaged Sanchez's eventual election to remain silent at trial. Agent Gutierrez, as a representative of the prosecution and an FBI agent with over 18 years experience, knew better than to purposefully direct the jury's attention to Sanchez's silence, yet she blatantly disregarded Sanchez's constitutional rights anyway. *See generally Madden v. Collins*, 18 F.3d 304, 309 (5th Cir. 1994) (recognizing that it is impermissible to even comment that "there's only one person here that knows the answer to all of these questions."). Courts simply cannot condone flagrantly offensive conduct on the part of Government actors, especially involving cases of this magnitude and complexity.

A curative instruction is not per se sufficient to cure the prejudicial effect of misconduct like that found in the instant matter. *Gongora v. Quarterman*, No. 07-70031, 2008 WL 4656992, at *5 (5th Cir. Oct. 22, 2008) (not designated for

publication); *compare, United States v. Griffith*, 118 F.3d 318, 325 (5th Cir. 1997) (holding error to be harmless where "it was an isolated comment, which did not 'strike at the jugular' of the defense, and which the jury was immediately instructed to disregard.") *with United States v. Johnston*, 127 F.3d 380, 399 (5th Cir. 1997) (holding that "[t]he prejudice resulting from a direct reference by a prosecutor to the exercise of [the constitutional right of a defendant to choose not to testify], coupled with an attempt to use the failure to testify to limit the jurors' personal deliberative process cannot be completely cured by a court instruction."). Although the District Court attempted to minimize the harm from Agent Gutierrez's comment by stating on the record "[t]hat will be stricken," ROA.8367., such statement did nothing to mitigate the harm that occurred.

In actuality, the District Court's attempted "curative instruction" simply compounded the error because it did nothing to redirect the jury's attention to the proper standards and burdens for its review of the evidence. The District Court's

remark wholly failed to stress the importance of the jurors not drawing any negative inferences from Agent Gutierrez's comments or Sanchez's future election of his right not to testify so as to sufficiently protect the rights of Sanchez.[6]

In *United States v. Johnston,* 127 F.3d 380, 399 (5th Cir. 1997), this Court considered whether a jury instruction, one that was more thorough than the instruction at issue here, was sufficient to cure a direct comment by the prosecutor on the defendant's failure to testify one day before jury deliberations began. There, after the improper comment by the prosecution, the district court instructed the jury as follows:

> The law does not require a defendant to prove his innocence or to produce any

---

[6] The following instruction would have done a better job at mitigating the harm to Sanchez, but the undersigned believes such an instruction would nonetheless still be insufficient to completely cure the harm to Sanchez:

> The defendant is required neither to present any evidence nor to testify. You may not, if the defendant chooses not to do so, consider that against him or in your consideration of the evidence or in any respect whatsoever. Agent Gutierrez has made an improper comment about the defendant and you are instructed to disregard entirely her comment.

*See generally Johnston,* 127 F.3d at 399.

> evidence at all and no inference whatever may be drawn from the election of a defendant not to testify.
>
> Yesterday morning when [the prosecutor] was giving—going over some of the instructions, she expected that I would give and remarked on one of these passages and [defense counsel] moved for a mistrial and I denied that and said the jury would follow my instructions. My instructions are these.
>
> Again, no inference whatever may be drawn from the election of a defendant not to testify.

*Johnston,* 127 F.3d at 399. This Court held that such instruction was insufficient to completely cure the prejudice caused to the defendant by such a reference. *Id.*

While the statement "[t]hat will be stricken" in this case may have been understood by the lawyers to mean the jurors were not to draw any inferences from what Agent Gutierrez had stated in open court, the jurors themselves cannot be expected to fully appreciate the significance of such a vague and generalized statement about the law and legal procedure. It is well settled that juries are presumed to follow the instructions of the Court, but that only applies when the

63

instruction fairly and adequately covers the issues presented. *See, e.g., Johnston*, 127 F.3d at 393 ("The instruction was thorough, and "juries are presumed to follow their instructions."); *United States v. Pool*, 660 F.2d 547, 558 (5th Cir. Unit B Nov. 1981), (noting courts have "substantial latitude in tailoring instructions so long as they fairly and adequately cover the issues presented"). The District Court's charge simply failed to fairly and adequately cover the issues presented and amounted to no curative instruction at all.

Sanchez and his associates are accused of participating in multiple acts of murder and mayhem in connection with their offenses. Multiple members of the TS testified against Sanchez at his trial in attempt to link Sanchez to their own criminal misconduct. Sanchez should have never been placed in the position he was placed by Agent Gutierrez's testimony before the jury — to personally get on the stand and answer Agent Gutierrez's call to testify or to simply let his trial lawyer impugn each witnesses' credibility through cross-examination.

Taken at face value, as recognized by all parties below, Agent Gutierrez's comment clearly reflects upon Sanchez's eventual decision not to testify. *See Johnston*, 127 F.3d at 397 (concluding the prosecutor demonstrated manifest intent to comment on the defendant's failure to testify where he asked witness "[a]ren't there some people in this courtroom that can back up what you say?"). The improper comment by the witness was highly prejudicial as it occurred toward the end of a week-long trial, right before the jury was set to deliberate. *See id.* at 399 ("The prosecutor's comment during closing argument was more prejudicial. It was a direct comment on defendant's failure to testify, and it occurred only one day before the jury began deliberations.").

To make matters worse, the Government then compounded the negative impact of the error upon Sanchez during its closing argument. The Government argued to the jury: "We've listened to the testimony of dozens of witnesses. . . . every single one of them stood their ground. Why? Because they were telling the truth. Their testimony was the truth."

ROA.9889. These closing remarks effectively encouraged the jury to draw an adverse inference from Sanchez's silence in determining the facts of the offense because a reasonable person would expect a man on trial for his life to tell his side of the story and prove the untruthfulness of the witnesses against him.[7]

In the end, Sanchez's election of his right not to testify (after being called out by Agent Gutierrez) proved costly — as the jury convicted him on little, if any, direct or circumstantial proof of wrongdoing on his part. *See Appellant's Brief Issue One* (discussing Sanchez's challenge to the strength of the Government's evidence); *see also United States v. Johnston*, 127 F.3d 380, 402 (5th Cir. 1997) (holding improper comment denied the defendant a fair trial where case against defendant was largely circumstantial and little direct testimony linked

---

[7] Sanchez anticipates the Government will argue the harm to Sanchez was also mitigated by the fact that the written jury charge later reminded the jury as to the proper burdens and standards. ROA.6651. While the charge may have contained such an instruction, it was nevertheless buried within fifty other pages of instructions in a case designated complex by the District Court. More importantly, there is no assurance that any type of instruction could ever begin to alleviate the harm to Sanchez because the witness's comment was so egregious that it struck at the jugular of Sanchez's defense. The written instruction was too little, too late.

him to the illegal narcotics trafficking). There can be little doubt that the constitutional error was so highly prejudicial that it had a substantial impact on the jurors' verdict given the weakness of the case the Government built against Sanchez. The District Court thus erred in denying Sanchez's motion for a mistrial, and this Court should reverse Sanchez's convictions and remand for a new trial.

### ISSUE THREE: THE DISTRICT COURT INFRINGED APPELLANT'S CONSTITUTIONAL RIGHTS BY ALLOWING THE GOVERNMENT TO ADMIT EVIDENCE OF APPELLANT'S GANG-AFFILIATED TATTOOS.

The Government's use of pictures of Sanchez's tattoos at trial was testimonial in nature, and he was, accordingly, compelled to be a witness against himself in violation of the Fifth Amendment. The photograph evidence was used after the Government had requested the Court to instruct Sanchez to remove his clothing so that he could display hidden tattoos to the jury. The Government should not have been allowed to rely on Sanchez's gang-affiliated tattoos to prove he conspired and engaged in the charged misconduct. Sanchez's convictions

must therefore be reversed and the cause remanded to the District Court for a new trial.

## A.    The relevant standards of review and applicable law

### 1.    <u>Harmless error standard applies</u>

The record shows that the Government initially requested to have the defendant stand up in court and remove his clothing so he could display his tattoos to the jury. ROA.7575. The Government made this request so that a prosecution witness could tell the jury that Sanchez has gang-affiliated "stamps." ROA.7575. To prevent this dramatic display in open court, defense counsel stipulated on the record that the Government had a photograph for admission accurately depicting the same tattoos of his client's body, which the Court ultimately admitted into evidence. ROA.7497, 7576-83, 7724-25.; *Government's Exhibits* 1 & 2. The undersigned believes that defense counsel's objection to the display of his client's body is sufficient to preserve his complaint for this Court's review.

This court reviews preserved objections to evidentiary

rulings for abuse of discretion, subject to the harmless error standard. *United States v. El–Mezain*, 664 F.3d 467, 494, 525–26 (5th Cir. 2011). Non-preserved evidentiary issues are reviewed for plain error. *United States v. Richard*, 775 F.3d 287, 295 (5th Cir. 2014). "[F]or any of the evidentiary rulings to be reversible error, the admission of the evidence in question must have substantially prejudiced [the defendant's] rights." *United States v. Sanders*, 343 F.3d 511, 519 (5th Cir. 2003).

### 2.    Relevant legal principles

The Fifth Amendment to the United States Constitution provides in part that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The right against self-incrimination bars only "compelled incriminating communications . . . that are 'testimonial' in character." *United States v. Hubbell*, 530 U.S. 27, 34 (2000). Put differently, to qualify for protection under the Fifth Amendment, a statement or other communication must be: (1) testimonial; (2) incriminating; and (3) compelled.

*Hiibel v. Sixth Judicial Dist. Ct.*, 542 U.S. 177, 189 (2004). While the Fifth Amendment generally does not prohibit the compelled exhibition of physical characteristics by a criminal defendant where such exhibition is not testimonial in nature, *see, e.g., Hubbell*, 530 U.S. at 35 (providing examples), it does prohibit the prosecution from relying on a tattoo when it is for the "content of what is written." *United States v. Greer*, 631 F.3d 608, 612 (2d Cir. 2011).

Courts have explained evidence of tattoos that are "openly visible on [a defendant's] body," or that can be read without "applying physical force" to the defendant are admissible even against a Fifth Amendment challenge. *Id.* at 613; *United States v. Toliver*, 387 F. App'x 406, 418 (4th Cir. 2010) (not designated for publication). Thus, tattoos on a defendant's face, neck, hands, and forearms ordinarily would be admissible. *See Toliver*, 387 Fed.Appx. at 418. Tattoos on the defendant's back, shoulders, torso, mid-section, legs, and feet, however, ordinarily would not be admissible against a Fifth-Amendment challenge. *See id.*; *United States v. Ledbetter*,

No. 2:14-CR-127, 2016 WL 2956250, at *5 (S.D. Ohio May 23, 2016).

**B.    The Government did not rely on any tattoo evidence to identify the Appellant; but rather, for the content of what was written to prove his TS gang affiliation and participation in the criminal enterprise**

The record shows that Sanchez was required to allow the police to photograph his numerous tattoos. ROA.8632-8649. Several of these photographs were admitted into evidence, not for identification purposes,[8] but rather as substantive evidence of Sanchez's affiliation with the TS. In particular, these photographs showed, at a minimum, the following tattoos: a longhorn on Sanchez's face; and the intertwined capital letters "T" & "S" on his upper arm. ROA.7497, 7576-83, 7724-25.; *Government's Exhibits* 1 & 2.

In particular, the "TS" symbol the jury observed in the Government photographs on Sanchez's arm was not openly

---

[8] The record shows that the Government initially requested to have the defendant stand up in court and remove his clothing so he could display his tattoos to the jury for a witness to tell the jury that Sanchez has gang-affiliated stamps. ROA.7575. To prevent this dramatic display in open court, defense counsel stipulated on the record that the Government had a photograph accurately depicting the same tattoos of his client's body.

visible on Sanchez's body and could only be read by applying physical force to Sanchez to reveal it. Sanchez was ultimately compelled to admit the existence and authenticity of his own self-incriminating tattoos and relieve the Government of its burden at trial after the Government sought the Court to order Sanchez to disrobe and reveal his tattoos in open court. The Fifth Amendment protects against such harm, and the District Court erred in its handling of the gang-affiliated tattoo evidence.

The evidence of Sanchez's gang-affiliated tattoos was clearly testimonial in nature and inadmissible. The Government did not need the tattoo evidence for a witness to use the defendant's tattoos to physically identify him as a participant in a crime. Thus, this is not a case where the presence of a tattoo stands in for other readily identifiable physical characteristics such as a defendant's height, hair color, voice, or handwriting style. *See Hubbell*, 530 U.S. at 34–35. Instead, the Government only sought to introduce evidence of Sanchez's tattoos for the content of what was written — to

prove Sanchez's gang membership and affiliation with the charged RICO enterprise.

## C.    A new trial is warranted because Appellant was compelled to incriminate himself during trial

It is wholly improper for the Government to have sought to compel Sanchez to disrobe in open court to secure its conviction of him. As a result of the Government's demands, Sanchez was forced to let the Government display photos of his gang-affiliated tattoos via photographs to mitigate the violation of his Fifth Amendment privileges. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) ("The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants."). The tattoo evidence was highly critical to the Government's case as evidenced by the prosecution's heavy reliance on it during its closing arguments.

The record shows the Government emphasized at closing arguments that "TS" refers to the Texas Syndicate and that everyone in the TS has a membership tattoo. ROA.9851, 9854. It explained to the jury that it is a very serious thing for an

individual to have a "TS" tattoo and not be a member of the gang because the individual would be killed by the TS for having it. ROA.9854. More importantly, the Government specifically directed the jury's attention to Sanchez's arm tattoo to explain to the jury that he is a TS member and thus a participant in the crimes: "That's Mr. Sanchez's arm. That's the TS tattoo. . . . He's a member. He's got the tattoo." ROA.9858-59, 9866.

The Government's use of pictures of Sanchez's tattoos at trial was testimonial in nature, and he was, accordingly, compelled to be a witness against himself in violation of the Fifth Amendment. No defendant should be compelled to incriminate himself in the manner Sanchez was forced to in the instant matter. The evidence of the defendant's gang-affiliated tattoos is incriminating because those tattoos would tend to show the existence of the charged RICO enterprise and the defendant's affiliation with it. As a result, due process mandates that a new trial is warranted based on the improper admittance of prejudicial and inflammatory gang-affiliated

tattoo evidence before the jury.

**ISSUE FOUR:     THE CUMULATIVE EFFECT OF THE ERRORS AT ISSUE SO FATALLY INFECTED APPELLANT'S TRIAL THAT THEY VIOLATED HIS TRIAL'S FUNDAMENTAL FAIRNESS.**

If this Court determines the two self-incrimination errors identified under Issues One and Three are not sufficient to constitute enough harm, independently, to warrant a new trial, Sanchez asks this Court to consider them collectively, under the cumulative error doctrine, and hold that the harm caused by both errors requires a new trial.

**A.     The relevant standards of review and applicable law**

Cumulative error justifies reversal when several errors "'so fatally infect the trial that they violated the trial's fundamental fairness.'" *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (quoting *United States v. Fields*, 483 F .3d 313, 362 (5th Cir. 2007)). The doctrine justifies reversal "only in the unusual case in which synergistic or repetitive error violates the defendant's constitutional right to a fair trial." *Id.*

**B.    The synergistic or repetitive effect of the errors at hand undermined the fairness of the underlying proceedings**

The circumstances before the Court fall within the rare class of cases so as to warrant relief under the cumulative error doctrine. In the instant matter, Sanchez's right against self-compelled incrimination was impugned not once, but twice and in two separate and distinct ways. Not only was Sanchez forced to endure the revelation of evidence depicting TS related tattoos on his body to the jury at the start of his trial, ROA.7575., a Government witness proceeded to directly comment on Sanchez's eventual failure to testify only one day before the jury began its deliberations. ROA.8365-67. Although the privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants, such right was infringed repeatedly from the beginning to the end of Sanchez's trial. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) ("The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants."). The

fundamental fairness of Sanchez's trial was clearly impugned under the cumulative error doctrine, and his convictions must be vacated by this Court for further proceedings.

## CONCLUSION

Based on the foregoing reasons, Sanchez respectfully requests this Court to vacate his convictions and to enter a judgment of acquittal as to all counts because he was convicted without evidence sufficient to establish every element of the crimes charged. In the alternative, Sanchez asks this Court to reverse and remand his case for a new trial to ensure due process occurs.

Respectfully submitted,

KELLER STOLARCZYK PLLC
234 W. Bandera Rd., No. 120
Boerne, Texas 78006
Tele: 830.981.5000
Facs:888.293.8580

Shane Stolarczyk

## <u>CERTIFICATE OF SERVICE</u>

I, Shane Stolarczyk, certify that today, November 11, 2016, a copy of Appellant's Brief and Record Excerpts were served via this Court's e-filing system on opposing counsel. I also certify that a hard copy of Appellant's Brief and Record Excerpts has been served on the defendant-appellant at the following address: George Sanchez, No. 83726-280, USP Florence (High), P.O. Box 7000, Florence, CO  81226.

_____

Shane Stolarczyk

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel hereby certifies as follows:

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains less than 12,669 words printed in a proportionally spaced typeface.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it is printed in a proportionally spaced, serif typeface using Bookman Old Style 14 point font in text and Bookman Old Style 12 point font in footnotes.

3. This brief complies with the privacy redaction requirements of 5th Circuit Rule 25.2.13.

4. This brief complies with 5th Circuit Rule 25.2.1 because it is an exact copy of the electronic submission.

5. This brief is free of viruses because it has been scanned for viruses with the most recent version of a commercial virus scanning program.

Shane Stolarczyk